Argued March 16, affirmed April 19, rehearing denied June 8, 1921.

## EATON et al. *v.* LAKE et al.

(197 Pac. 292.)

**Animals—Defense must Prove Statutory Justification for Killing Dog.**

1. In an action for killing a dog, defendant on the ground that the killing was justified under Section 9359, Or. L., plaintiffs, by proving ownership and value of the dog and killing by the defendants, establish a *prima facie* case, requiring defendants to prove that the dog was killed while chasing or wounding sheep, or under

---

1. Authorities discussing the question of right to kill dogs generally are collated in notes in 67 Am. St. Rep. 293; 40 L. R. A. 510; 19 L. R. A. (N. S.) 835; 28 L. R. A. (N. S.) 673; L. R. A. 1915C, 859.

circumstances satisfactorily showing that it had been recently engaged in chasing and wounding sheep for the purpose of killing them.

**Animals—Justification for Killing Dog is Held Question for Jury.**

2.    In an action for killing a dog, in which defendants claimed that the killing was justified under Section 9359, Or. L., whether the dog had killed or chased defendants' sheep, or had merely frightened the sheep while rounding up plaintiffs' cows, *held,* a question for the jury.

From Deschutes: T. E. J. DUFFY, Judge.

Department 1.

The plaintiffs are husband and wife and were engaged in the stock and dairy business in Deschutes County, and the owners of a dog named Tip, which was valuable in the handling of their stock "and enabled them to get along with much less hired help in their business than they could without the use of said dog." The defendant Murphy was the owner of a band of sheep, and the defendant Lake was in his employ as a herder. The complaint alleges that on September 4, 1918, the defendants, while acting and conspiring together, did wrongfully and unlawfully kill the dog, by reason of which the plaintiffs were damaged $500.

For answer "defendants admit that they did kill a certain dog on or about said date, but deny that the plaintiffs, or either of them, were damaged in the sum of $500, or any other sum," or that the dog was wrongfully or unlawfully killed; and as a further and separate answer allege that the plaintiffs were the owners of a certain vicious dog;

"that on or about the said fourth day of September, 1918, while these defendants were in charge of and herding the sheep of one Peter Murphy, upon lands in Deschutes County, Oregon, to which the said Peter Murphy was entitled to the possession, the plaintiffs herein permitted said dog, unlawfully, to run at large

and to bite, kill, and injure the sheep of the said Peter Murphy then and there in charge of the said defendants and to scatter said sheep and cause the loss thereof to the said Peter Murphy; that while the said dog was in the act of so killing and injuring and scattering said sheep, the defendants herein, in order to prevent further loss and destruction of said sheep and to prevent the said dog from further killing and injuring other sheep, did kill said dog."

The reply denied all the new matter of the further and separate answer. The cause was tried to a jury, which returned a unanimous verdict for the plaintiffs for the full amount of their claim, upon which judgment was entered. The defendants appeal. During the trial the defendants filed motions for a nonsuit and directed verdict. They assign as error the overruling of the motions, and contend that there is "no evidence upon which the jury could render a verdict for the plaintiffs in any sum whatever." No instructions were requested, and no exceptions were taken to the charge of the court.        AFFIRMED.

For appellant there was a brief over the names of *Mr. R. S. Hamilton* and *Mr. E. O. Stadter,* with an oral argument by *Mr. Hamilton.*

For respondent there was a brief and an oral argument by *Mr. W. P. Myers.*

JOHNS, J.—Section 9358, Or. L., provides:

"Be it enacted by the Legislative Assembly of the State of Oregon, that the owner of any dog shall be liable for all damages that may accrue to any person or persons in the state by reason of such dog killing, wounding, or chasing any sheep or other domestic animal belonging to such person or persons, the same to be recorded [recovered] in an action for debt before any court having jurisdiction."

Section 9359, Or. L., says:

"If any person shall discover any dog in the act of killing, wounding, or chasing any sheep or other domestic animals, in any portion of this state, or shall discover any dog under such circumstances as to satisfactorily show that such dog has been recently engaged in killing or chasing sheep or other domestic animals, for the purpose of killing them, such person is authorized to immediately pursue and kill such dog."

Both sections were enacted in 1860, and apparently neither of them have ever been construed by this court. In the Session Laws, they are combined in one law which is entitled: "An Act to provide for the protection of Sheep and other Domestic Animals." The defendants contend that the dog was discovered "in the act of killing, wounding, or chasing sheep" or "under such circumstances as to satisfactorily show that such dog has been recently engaged in killing or chasing sheep," and that for such reasons, the killing of the dog was justifiable under Section 5523, Or. L. The defendants having admitted the killing of the dog, it was for them to prove facts which would justify the killing. After reading Section 5523 to the jury, the court gave the following instruction:

"If you find that the dog in this case was chasing and attempting to kill the sheep, and he was found so doing, or if he had been chasing and killing the sheep he was afterwards pursued and killed, and if you find this by the preponderance of the testimony, that he was so chasing the sheep, then you will find for the defendant; on the other hand, if you find those are not the facts, that he was not chasing and killing the sheep, or that he had not been chasing or killing any sheep, then you will be entitled to find for the plaintiff. Those are questions you will thresh out in the jury-room. Apply the law as I have read it to you."

J. B. Eaton is the father of the plaintiff, R. E. Eaton, and on the morning of September 4th started on foot to drive 21 cows, one steer and three young calves to the Arnold ranch, about 15 miles distant, and took the dog along to help drive the cattle. Most of the way the road was through the timber. Eaton says:

"I didn't pay very much attention to the dog, because whenever the stock worked out in the timber I could see him working on one side or the other bringing them in the road."

Near the end of the journey the calves got tired, lagged behind, and often lay down and caused delay and made more or less trouble, and Eaton gave his personal attention to them, and the dog looked after and herded the older cattle, which were in the lead, and kept them in the road. In their brief, defendants quote and rely upon the following testimony as conclusive proof that the dog was discovered in the act of wounding or chasing Murphy's sheep, or that it had been recently engaged in chasing the sheep for the purpose of killing them, and that they were legally justified in killing the dog. J. B. Eaton says:

"I heard a great roaring sound, and didn't think anything then of the dog. My cattle were moving along on the road, and I saw a band of sheep stampeded; they ran across the road in front of me, perhaps 150 yards, and on over towards kind of an open field there was there. * * The sheep had passed on, and I sat there kind of settling a few cattle I had there, keeping them quiet, and a young fellow by the name of Lake—he told me his name was Lake, Roy Lake—came and said, 'You had a dog?' and I said, 'Yes.' 'Well,' he said, 'You have got no more dog; I killed him.' I said, 'What did you kill him for?' 'Because,' he said, 'I saw him after the sheep, running the sheep.' I think he said he killed some of

the sheep. 'Anyhow, he ran after the sheep; stampeded the sheep. I think he said he killed some. I said, 'I don't think he could—I don't think you could make the dog kill any.' 'Well, he killed them, all right.' "

The plaintiff Robert E. Eaton testified.

"I asked him what he killed him for, and he said it was in the heat of passion, and the dog had stampeded the sheep. I wanted to see the dead sheep, and he said the dog did not kill any, but crippled them up."

Speaking of a conversation with the defendant Lake, the sheriff testified:

"Q. Mr. Roberts, at the time you had this conversation, was there anything said as to whether or not this dog was chasing sheep?

"A. I think so.

"Q. They said he was chasing the sheep?

"A. I think he said that.

"Q. You are pretty sure he said that?

"A. Yes, sir."

As to this conversation E. L. Clark testified:

"Q. Was there anything said at that time about whether any sheep were actually killed or not?

"A. Yes, sir.

"Q. What was said?

"A. He said he didn't kill any sheep; he said he had one sheep down, but he didn't kill it.

"Q. The facts were, the dog had one sheep down, but didn't kill it?

"A. Yes, sir, that is what he said.

"Q. How many other sheep did he say he had injured, if any?

"A. He didn't tell us there at that time that he had injured any other sheep. He said he was among the sheep, scattered them, and that he had one sheep down, but didn't kill him.

"Q. Sort of chasing after them?

"A. That is what he said—just what I told you."

William Masten testifies as follows:

"Q. Just answer the question: At the time the herder struck the dog and tried to kill him, was he biting or injuring the sheep, or chasing them?

"A. Yes, sir; he was right in them, chasing them.

"Q. Do you know of your own knowledge about how many he bit?

"A. No, sir; I do not.

"Q. Do you know whether or not there was more than one?

"A. Yes, sir.

"Q. There was about how many, do you think?

"A. I know of three.

"Q. Were they bitten quite badly?

"A. Yes, sir.

"Q. How close were you to the sheep at the time the dog was chasing them?

"A. I was right at the head of them. We took them out and went around the head so they could not go any further."

Vernon Masten gives the following testimony:

"Q. How did it come to be the dog was killed?

"A. The dog was chasing the sheep; we heard him, and one of the cows got in the band of sheep, and Mr. Eaton sent the dog after the cow, and the dog went after the sheep. We were leaving the sheep browse, and heard the dog barking, and we ran up, and he was chasing them and the sheep were down. I come on to a new place, a place where there was hardly any trees, and the dog had a sheep, tearing the wool out of it, and William called the dog, and it came to him, and Roy Lake took the dog and took a club and started in to kill him.

"Q. Was the dog biting the sheep when he had it down?

"A. Yes, sir.

"Q. Do you know how many he bit?

"A. Three.

"Q. Did he bite them pretty bad?

"A. Yes, sir.

"Q. Did they bleed?

"A. Two of them; one of them wasn't bit up very bad.

"Q. Two of them were bit up pretty bad, were they?

"A. Yes, sir."

Upon this evidence, the appellants contend that they were entitled to a directed verdict. In *Hinckley* v. *Emerson,* 4 Cow. (N. Y.) 351 (15 Am. Dec. 383), it is said:

"It seems to be law that where a dog chases and kills one's domestic animals on his land, he may kill the dog: *Wadhurst* v. *Damme,* Cro. Jac. 45; *Barrington* v. *Turner,* 3 Lev. 28. But if the dog merely chases or bites an animal, in order to justify killing the dog, it is necessary to show that he could not otherwise be separated: *Wright* v. *Ramscott,* 1 Saund. 84. But where a dog is ferocious and attacks persons, he may be killed, being considered a nuisance: *Putnam* v. *Payme,* 13 Johns. 312. The statute, allowing dogs that attack sheep to be killed, recognizes the common-law doctrine as above laid down: and *vide Brock* v. *Copeland,* 1 Esp. Rep. 203; *Boulton* v. *Banks,* Cov. Car. 254; *Kinnon* v. *Davies,* Cov. Car. 487. The judgment must be affirmed."

From time immemorial the law has recognized the right of the master of the flock to kill a sheep-killing dog caught in the commission of the act. R. C. L., Volume 1, Section 70, says:

"Also, owing to the fact that sheep owners are especially subject to loss and annoyance from the predatory and wolfish instincts of dogs, it has always been held that a sheep-stealing dog, found lurking about or roaming over a man's premises where sheep are kept, incurs the penalty of death."

In 1899, Missouri enacted our identical statute. In the case of *Reed* v. *Goldneck,* 112 Mo. App. 310 (86 S. W. 1104), the Missouri Court of Appeals says:

"Prior to the enactment of Revised Statutes of 1899, section 6976, one was not justified in killing a dog, even though it was on his premises, unless it was actually doing injury, or attempting to do injury, and threatening imminent peril to the proprietor's domestic animals.

"Revised Statutes of 1899, Section 6976, authorizing the killing of dogs discovered in the act of killing, wounding, or chasing sheep, or under such circumstances as to satisfactorily show that they have been recently engaged in killing or chasing sheep or other domestic animals, is an act of outlawry, not only against sheep-killing dogs, but against dogs discovered under suspicious circumstances which indicate that they have recently been engaged in killing or chasing sheep or other domestic animals, and authorizes the killing of such dogs, even by another than the owner of the animals killed or injured, or supposed to have been killed or injured."

The dog in question was raised and trained as a cattle dog, and the jury found that it had a value of $500, and there is no evidence that it ever had been around or in any way mingled with sheep previous to September 4th. In testifying to a conversation with the defendant Lake, the plaintiff Robert E. Eaton says:

"I asked him what he killed him for, and he said he was in a heat of passion and was mad, and the dog had stampeded the sheep. I wanted to see the dead sheep, but he said the dog did not kill any sheep, but crippled them up. I said, 'There is no dead sheep you can show me?' He said, 'No,' but he said he was very sorry he had killed the dog, and he was willing to pay if he had anything to pay with, and wait until the boss came, and chances are it would be straightened up. I asked him if they were willing to pay for the dog, and he said he was, because he knew he made a big mistake in killing the dog, but he didn't think when he was mad."

This is substantially corroborated by the evidence of the sheriff and the witness Clark. William Masten testified:

"Q. Now, William, at the time Mr. Lake began to beat the dog he had possession of him, and the dog was not at that time chasing sheep?

"A. No, sir; he just had been.

"Q. He just had been?

"A. Yes, sir.

"Q. You called him to you and he came to you?

"A. Yes, sir."

His brother Vernon says:

"Q. How did it come to be the dog was killed?

"A. The dog was chasing the sheep, we heard him, and one of the cows got out in the band of sheep, and Mr. Easton sent the dog after the cow, and the dog went after the sheep. We were leaving the sheep browse and heard the dog barking, and we ran up, and he was chasing them, and the sheep were down. I come on to a new place, a place where there was hardly any trees, and the dog had a sheep, tearing the wool out of it, and William called the dog, and it came to him and Roy Lake took the dog and took a club and started in to kill him.

"Q. You say some of the cows were in among the band of sheep and the dog went after the cow; was that the way?

"A. Yes, sir.

"Q. That scared the sheep and the sheep began to run?

"A. Yes, sir.

"Q. Then after the sheep began to run the dog got hold of one of the sheep, didn't he?

"A. Yes, sir.

"Q. How long did he hold the first sheep he got hold of?

"A. He just held a little while and then went on.

"Q. Did he catch another one?

"A. Yes, sir.

"Q. How long did he hold it?

"A. He just bit it and knocked it down and went on, and over a little further he had a sheep down and was tearing him up.

"Q. As soon as your brother William called the dog, the dog came right to him, did it?

"A. Yes, sir.

"Q. The dog was friendly, was it?

"A. Yes, sir.

"Q. Wasn't attempting to bite anybody?

"A. No, sir.

"Q. It wasn't attempting to bite any person; it was friendly to all of you, and Mr. Lake took the dog by the tail and beat him over the head with the big club?

"A. Yes, sir.

"Q. Did you see Mr. Murphy then when he came back to where the dog was?

"A. Yes, sir.

"Q. What was the dog doing when you came back to him?

"A. He raised up and looked at us, and the boss shot him.

"Q. Did he raise on his front feet?

"A. No, sir; just turned his head and looked at us, and the boss shot him.

"Q. And it wasn't trying to kill any sheep when the boss shot him?

"A. No, sir.

"Q. The poor thing was lying there trying to get up?

"A. Yes, sir."

'Although as a defense the defendants allege that the sheep were on lands to which Murphy was entitled to possession, there is no evidence as to the ownership of or the right to the possession of the lands where the sheep were grazing.

1, 2. The case was tried in a sheep and cattle country. The instructions were fair, and the jury rendered a unanimous verdict for the full amount of plaintiffs' claim. There is testimony tending to show

that the dog was kind, obedient, intelligent, and well trained in the handling and driving of cattle. The jury was instructed that if the dog was found "chasing and attempting to kill the sheep" or if he "had been chasing and killing the sheep * * and was afterwards pursued and killed," it should then return a verdict for the defendant. The conversation of defendant Lake with the plaintiff R. E. Eaton was not denied, explained, or contradicted. In this Lake said that the dog had stampeded the sheep, and that he was mad and in a heat of passion, and that he was very sorry he had killed the dog, and was willing to pay if he had anything to pay with, and that, if he would wait until the boss came, the chances are it would be straightened up, and that he knew "he made a big mistake in killing the dog, but he didn't think when he was mad." This was about three days after the dog was killed, and the evidence went in without objection. From it the jury could find that through the stampeding of the sheep, Lake was in a heat of passion, and that he then realized that he had wrongfully and unlawfully beaten the dog, and was ready and willing to pay the damage. If Lake was not justified in beating the dog, it must follow that Murphy was not justified in killing it. The evidence also tends to show that when Murphy came down from camp with his gun about an hour after Lake had beaten the dog, that he was violent and very angry, and in that condition when he shot the dog. When the plaintiffs proved the ownership and the killing of the dog by the defendants, and its value, the duty then devolved upon the defendants to prove that it was killed while in the chasing and wounding of the sheep or under such circumstances as to satisfactorily show that it had been recently engaged in

the chasing and wounding of the sheep for the pur-
pose of killing them, and it is true that the conversa-
tion with Lake introduced by the plaintiffs and the
evidence for the defendants is strong proof of the
fact.   Vernon Masten testified that one of the cows
got out in the band of sheep, and Mr. Eaton sent the
dog after the cow, and the dog went after the sheep,
and that some of the cows were in among the band
of sheep, and the dog went after the cows, and that
scared the sheep and the sheep began to run.   From
the nature and training of the dog, the jury could
infer from this evidence that the dog went among
the sheep in pursuit of and for the purpose of rounding
up the cow.   It is true that, although the primary pur-
pose of the dog may have been to round up the cow,
that the evidence of the eye-witnesses tends to show
that after the dog got among the sheep, it commenced
to chase them.   But the proof is also clear that when
the Masten boy spoke to the dog, it came straight to
him, and was then beaten with a club by Lake.   The
jury may have found that the dog went among and
stampeded the sheep for the purpose of rounding up
the cow, and that the dog was never actually engaged
in the chasing or wounding of the sheep; otherwise,
under the instructions, it could not have returned a
verdict for the plaintiffs.   As to whether the dog was
actually engaged in doing this was a matter of de-
fense.   The statute was intended to justify the killing
of any dog discovered in the act of killing, wounding,
or chasing of any sheep or the killing of any dog
"under such circumstances as to satisfactorily show
that such dog had been recently engaged in killing
or chasing sheep or other domestic animals for the
purpose of killing them," and the jury was so in-
structed.   Its primary purpose was to protect the

flock master from dogs that would chase, wound, or kill sheep, and it devolved upon the defendants to prove that the acts of the dog in question brought it within one of those classes. As to what the dog actually did and how it was done were both matters within the exclusive knowledge of the defendants and their witnesses. In view of the statements and admissions of Lake and the evidence of Vernon Masten, it may be that the jury did not believe the evidence on behalf of the defendants that the dog was actually engaged in the chasing or wounding of the sheep.

When all of the evidence is considered as the nature, habits, training, and intelligence of the dog and the statements and admissions of Lake, and that at the bidding of his master the dog went out among the sheep for the purpose of rounding up the cow, with all the surrounding facts and circumstances, we cannot say, as a matter of law, that there is not sufficient evidence to support the verdict. The judgment is affirmed.        AFFIRMED. REHEARING DENIED.

McBRIDE and HARRIS, JJ., concur.

BURNETT, C. J., Dissenting.—In this case there is no dispute but that the dog in question chased sheep which were in custody of the defendants, bit some of them, and was caught in the very act. The witnesses for the defendants are corroborated in a degree on this point by the testimony of the principal witness for the plaintiff, who saw the sheep stampeded in the direction of the place where the dog was killed.

Section 9359, Or. L., is quite plain, reading thus:

"If any person shall discover any dog in the act of killing, wounding, or chasing any sheep or other domestic animals in any portion of this state, or shall

discover any dog under such circumstances as to satisfactorily show that such dog has been recently engaged in killing or chasing sheep or other domestic animals for the purpose of killing them, such person is authorized to immediately pursue and kill such dog."

It is argued that because one of the defendants stated that he was sorry he killed the dog and offered to pay for him, his attitude thus expressed is to be taken as evidence that the dog was not killing sheep. This argument is fallacious. While the defendants, who discovered the dog chasing and biting the sheep, had a right to kill him as they did, they were not obliged to do so, and their regret at not having pursued milder measures is not in any sense a surrender of their actual statutory right to take the extreme remedy. The question of excessive defense of one's property is not involved. When any dog of whatever value is caught "in the act of killing, wounding or chasing any sheep," the statute marks him for slaughter at the hands of whoever catches him.

The Circuit Court ought to have allowed the motion of the defendants for a directed verdict in their favor, at the close of all the evidence in the case, and the judgment should be reversed, with directions to enter a judgment for the defendants, there being no testimony whatever in the record to sustain the verdict.

For these reasons I dissent from the opinion of Mr. Justice JOHNS.